**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 41 MAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 654 MDA 2016 dated |
| | : | November 8, 2017, reconsideration |
| v. | : | denied January 18, 2018, Reversing |
| | : | the Order of the Clinton County Court |
| | : | of Common Pleas, Criminal Division, |
| JEFFERY CHARLES MAGUIRE, | : | at No. CP-18-CR-396-2015, dated |
| | : | March 22, 2016. |
| Appellant | : | |
| | : | ARGUED:  May 15, 2019 |

*Justice Baer delivers the Opinion of the Court as to Parts I, II, and IV, and announces the Judgment of the Court.  Justice Baer also delivers a plurality opinion as to Part III.*

**OPINION**

**JUSTICE BAER**                                         **DECIDED:  August 22, 2019**

In *Commonwealth v. Tarbert*, 535 A.2d 1035 (Pa. 1987) (plurality), and *Commonwealth v. Blouse*, 611 A.2d 1177 (Pa. 1992), this Court adopted guidelines for assessing the constitutionality of government-conducted systematic vehicle checkpoints to which the entirety of the public are subjected.  Our primary task in this appeal is to examine whether the *Tarbert/Blouse* guidelines are applicable to statutorily authorized warrantless inspections of commercial vehicles.  We hold that these guidelines are inapplicable in assessing the constitutionality of statutorily authorized warrantless inspections of commercial vehicles; instead, such inspections should be scrutinized in accord with the test outlined by the United States Supreme Court in *New York v. Burger*,

482 U.S. 691 (1987), and adopted by this Court in *Commonwealth v. Petroll*, 738 A.2d 993 (Pa. 1999), which we discuss in detail *infra*. Because a panel of the Superior Court, in a two-to-one majority decision, reached the correct result, we affirm that court's judgment, which reversed a trial court's order granting a motion to suppress evidence filed by Jeffery Maguire ("Appellant").

## I. Background

We glean our summary of this matter primarily from the trial court's findings-of-fact entered after a hearing on a motion to suppress the evidence filed by Appellant. Trial Court Opinion and Order, 3/22/2016, at ¶¶ 1-35. The court's findings are supported by the record.

On May 20, 2015, the Pennsylvania State Police and the Pennsylvania Department of Environmental Protection ("DEP") set up a commercial vehicle inspection program authorized by Subsection 4704(a)(2) of the Vehicle Code, 75 Pa.C.S. § 4704(a)(2), which provides as follows:

> **(2) Systematic vehicle inspection programs.--**Any Pennsylvania State Police officer or qualified Commonwealth employee engaged in a systematic vehicle inspection program may inspect any vehicle, driver, documents, equipment and load to determine whether they meet standards established in department regulations.

75 Pa.C.S. § 4704(a)(2).

The inspection program was scheduled approximately one month in advance and occurred at a Clinton County landfill located in the Village of McElhatten. Pennsylvania State Trooper Cory Beaver, a Motor Vehicle Enforcement Officer, and a Motor Carrier Enforcement Supervisor comprised the three person Commercial Vehicle Enforcement Team ("Team") that conducted the checkpoint inspections. The Team was stationed in a lot in front of the scale house near the entrance of the landfill. They established and

utilized a procedure whereby the first Team member available would stop the next truck entering the landfill.

At approximately 2:50 p.m., it was Trooper Beaver's turn to inspect a truck when he observed a red and white International tri-axle dump truck about to enter the Landfill. The trooper exited his vehicle and motioned for that truck to pull into the lot where the Team was located. The driver of that vehicle was Appellant, and he complied with the trooper's request. Trooper Beaver then approached the truck.

Appellant opened the truck's driver's side door, and Trooper Beaver engaged Appellant in conversation. The trooper asked Appellant to provide him with documents pertinent to the truck and its operation before he began the actual inspection of the truck. During the course of this conversation, the trooper detected the smell of alcohol on Appellant's breath. Trooper Beaver then conducted a "Level Two" inspection, which included a review of Appellant's documents and a walk-around inspection of the truck, checking its lights, horn, wipers, tires, and wheels.

Following the inspection, Trooper Beaver had Appellant exit the truck, told him that he smelled of alcohol, and asked whether he had been drinking. Appellant stated that he drank one beer on his trip to the landfill. At that point, the trooper noticed a cooler on the floor of the truck near the gearshift. The trooper inquired as to the contents of the cooler, and Appellant responded that he had placed water and beer in it. The trooper observed that the cooler contained a yellow plastic bag that was wet from ice, three twelve-ounce cans of Busch Light beer, and one or two bottles of water. Trooper Beaver then had Appellant perform field sobriety testing, which Appellant ultimately failed. The trooper arrested Appellant, who was transported to the Jersey Shore Hospital for blood testing. The Commonwealth charged Appellant with several counts of driving under the influence ("DUI"), as well as five counts of unlawful activities.

Appellant subsequently filed a motion to suppress the evidence. In that motion, Appellant contended that, to meet Fourth Amendment constitutional search and seizure requirements, the Team's inspection program needed to comply with the *Tarbert/Blouse* guidelines, which were promulgated to test the constitutionality of systematic, police-conducted vehicle checkpoints. Regarding these guidelines, Appellant noted, this Court has explained that to pass constitutional muster under *Tarbert/Blouse*, a vehicle checkpoint must meet the following five criteria:

> (1) vehicle stops must be brief and must not entail a physical search;
>
> (2) there must be sufficient warning of the existence of the checkpoint;
>
> (3) the decision to conduct a checkpoint, as well as the decisions as to time and place for the checkpoint, must be subject to prior administrative approval;
>
> (4) the choice of time and place for the checkpoint must be based on local experience as to where and when intoxicated drivers are likely to be traveling; and
>
> (5) the decision as to which vehicles to stop at the checkpoint must be established by administratively pre-fixed, objective standards, and must not be left to the unfettered discretion of the officers at the scene.

*Commonwealth v. Worthy*, 957 A.2d 720, 725 (Pa. 2008).

Citing to the Superior Court's decision in *In re J.A.K.*, 908 A.2d 322 (Pa. Super. 2006) (applying the *Tarbert/Blouse* guidelines to a seatbelt checkpoint), Appellant argued that, like checkpoints applicable to the general public, commercial vehicle safety checkpoints must comply with the *Tarbert/Blouse* guidelines to survive a constitutional challenge. Appellant solely asserted that the inspection checkpoint to which he was subjected on May 20, 2015, failed to meet these guidelines. Because Appellant believed that Trooper Beaver unconstitutionally searched and seized him as part of the inspection program, he argued that the trial court should suppress any evidence discovered as "fruit of the poisonous tree."

On March 14, 2016, the trial court held a hearing on Appellant's motion to suppress. Trooper Beaver was the only witness to testify at the hearing, and he testified to the facts as stated above. In terms of legal arguments, Appellant reiterated his position that the May 20th inspection of his dump truck was unconstitutional because the Team's program failed to comply with the *Tarbert/Blouse* guidelines. For its part, the Commonwealth contended that the *Tarbert/Blouse* guidelines are inapplicable to commercial vehicle safety checkpoints that are authorized by statute. In this regard, the Commonwealth highlighted that Section 4704 of the Vehicle Code specifically allows for systematic inspections of trucks like the program conducted by the Team on May 20, 2015.

At the end of the suppression hearing, the trial court stated that the parties could submit post-hearing legal memoranda, and the Commonwealth took advantage of that opportunity. In its memorandum, the Commonwealth renewed its contention that the *Tarbert/Blouse* guidelines do not apply to statutorily authorized commercial vehicle inspections. In support of its position, the Commonwealth invoked several cases, including *Commonwealth v. Petroll*, 738 A.2d 993 (Pa. 1999), for the proposition that "[t]ruck drivers of commercial vehicles are part of a closely regulated industry that, due to public safety concerns, are entitled to less Fourth Amendment protections tha[n] those of regular drivers on the highways." Commonwealth's Memorandum of Law, 3/16/2016, at 1.

According to the Commonwealth, pursuant to *Petroll*, warrantless inspections of vehicles involved in a closely regulated industry are constitutionally permissible if: (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspections are made; (2) warrantless inspections are necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of certainty and

regularity of its application, provides a constitutionally adequate substitute for a warrant, *i.e.*, the regulatory statute must perform the two basic functions of a warrant:  it must advise the owner of the commercial business that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.  The Commonwealth insisted that the commercial vehicle inspection program that occurred in this case was authorized by Section 4704 of the Vehicle Code and met these constitutional requirements.

On March 22, 2016, the trial court entered an opinion and order granting Appellant's motion to suppress.  In so doing, the court observed that in *Commonwealth v. Garibay*, 106 A.3d 136 (Pa. Super. 2014) (applying the *Tarbert/Blouse* guidelines to a seatbelt checkpoint), the Superior Court held that there is no difference in the standards required for establishing DUI and non-DUI checkpoints.  Based upon this premise, the trial court concluded that the *Tarbert/Blouse* guidelines apply to the commercial vehicle inspection program to which Appellant was subjected.  The court ultimately determined that the Commonwealth failed to prove that the program met three of the five guidelines, namely:  (1) that there was sufficient warning of the checkpoint; (2) that the decision to conduct the checkpoint was subject to prior administrative approval; and (3) that the choice of time and place for the checkpoint was based on local experience as to where and when violating drivers were likely to be traveling.  The Commonwealth timely filed a notice of appeal, certifying that the trial court's order will terminate or substantially handicap the prosecution.  Pa.R.A.P. 311(d).

On appeal, the Commonwealth again argued that the *Tarbert/Blouse* guidelines do not apply to statutorily authorized inspections of commercial vehicles and that the Team's May 20, 2015, inspection program met the appropriate constitutional standards. In a published opinion, a majority of a three-judge Superior Court panel agreed with the

Commonwealth and, thus, reversed the trial court's order. *Commonwealth v. Maguire*, 175 A.3d 288 (Pa. Super. 2017). In so doing, the Superior Court initially discussed the United States Supreme Court's decision in *New York v. Burger*, 482 U.S. 691 (1987).

According to the Superior Court, the *Burger* Court recognized an exception to the Fourth Amendment warrant requirement, holding that an owner or operator of a commercial business or vehicle in a closely regulated industry has a substantially reduced expectation of privacy, and therefore, the warrant and probable cause requirements applicable to these individuals are lower. The Superior Court stated that the *Burger* Court also concluded, in the context of closely regulated industries, that a warrantless inspection is constitutional if: (1) there is a substantial governmental interest informing the regulatory scheme pursuant to which the inspection was made; (2) warrantless inspections are necessary to advance the regulatory scheme; and (3) the statute's inspection program is applied with such certainty and regularity as to prove a constitutionally adequate substitute for a warrant. The Superior Court noted that, in *Burger*, the High Court "ultimately held that a valid administrative inspection without a warrant that uncovers evidence of a crime does not violate the Fourth Amendment." *Maguire*, 178 A.3d at 291.

Next, the Superior Court turned its attention to *Petroll*, *supra*, where this Court addressed the constitutionality of a warrantless search of a tractor-trailer immediately after the driver of that vehicle, Petroll, caused a deadly crash. Important to this matter, the *Petroll* Court held that trucking is a closely regulated industry and that the three-factor *Burger* test controlled whether the warrantless search of Petroll's truck survived constitutional scrutiny. After applying that test, the Court ultimately concluded that the search of Petroll's truck was unconstitutional.

Turning back to the matter *sub judice*, the Superior Court, consistent with *Petroll*, held that the trucking industry is closely regulated and that businesses and individuals engaged in that industry have a lower expectation of privacy than people driving their personal vehicles. The court then opined that, because these businesses and individuals (including commercial vehicles) have a lower expectation of privacy, the *Tarbert/Blouse* guidelines, which gauge the constitutionality of safety checkpoints to which the entire public are subjected, do not apply to inspections specifically aimed at commercial vehicles in the trucking industry. Stated differently, the court determined that commercial vehicle inspection programs authorized by statute must meet the less stringent *Burger/Petroll* test to pass constitutional muster, as closely regulated industries and those engaged in those industries have a lesser expectation of privacy than the public generally.

Next, the Superior Court analyzed whether warrantless inspections conducted pursuant to Subsection 4704(a)(2) of the Vehicle Code comply with the principles reiterated in *Petroll*. In other words, the court constitutionally scrutinized Subsection 4704(a)(2). The court concluded that Subsection 4704(a)(2) "easily" satisfies the first *Burger* factor. *Id.* at 293. Indeed, the court noted that, in *Petroll*, this Court concluded that Subsection 4704(a)(2) is part of a statutory scheme that regulates the trucking industry, advancing the substantial government interest in ensuring road safety. The court also held that the systematic vehicle inspection program authorized by Subsection 4704(a)(2) meets the second *Burger* criterion because it "advances the government interest by removing unsafe vehicles from the roadways before accidents occur." *Id.* (citing *Petroll*, 738 A.2d at 1003). Stated differently, warrantless inspections are necessary to further Subsection 4704(a)(2)'s scheme of surprise government inspections of potentially dangerous vehicles engaged in the trucking industry

The Superior Court further concluded that Subsection 4704(a)(2) satisfies the third *Burger* factor because "it advises the operator of a commercial vehicle that the regulatory search is being made pursuant to the law, it has a properly defined scope, and it limits the discretion of inspecting officers." *Id.* The court, therefore, held that Subsection 4704(a)(2), "on its face, is sufficiently comprehensive and defined so that a commercial truck driver is informed that his truck may be subject to periodic administrative inspections undertaken to ensure that the truck complies with DOT regulations and is road-safe." *Id.* (citing *Burger*, 482 U.S. at 703, and *Petroll*, 738 A.2d at 1004).

The court bolstered this holding by referring to Trooper Beaver's testimony at the suppression hearing. According to the court, "Trooper Beaver's uncontradicted testimony at the suppression hearing supports this conclusion as it provided an understanding of the limits on the system of inspection and the lack of discretion the inspectors had in selecting which trucks to inspect." *Id.* For these reasons, the Superior Court found that the inspection at issue was constitutionally sound and that the trial court erred by holding to the contrary.

One jurist authored a dissent. The dissent agreed with the majority that, because trucking is a closely regulated industry, the Team's inspection program had to comply with the three-factor *Burger* test. However, the dissent suggested that both commercial and non-commercial vehicles are heavily regulated. To support this suggestion, the dissent highlighted, *inter alia*, some historical aspects of the Vehicle Code.

Specifically, the dissent observed that, in 1985, the Legislature amended Section 4704, which addresses police inspection programs of commercial vehicles, as well as Section 6308 of the Vehicle Code, 75 Pa.C.S. § 6308, which pertains to police inspection programs of non-commercial vehicles.[1] According to the dissent, "[t]hese statutory

---

[1] Most relevant to this appeal, Section 6308 provides:

amendments provided the authority for warrantless systematic inspections or checkpoints, of both commercial and non-commercial vehicles, and our Supreme Court's subsequent 1987 decision in *Tarbert*, and its 1992 decision in *Blouse*, set forth guidelines to assure that the inspection programs provide a constitutionally adequate substitute for a warrant." *Maguire*, 175 A.3d at 299 (Lazarus, J., dissenting). The dissent opined that "the statutory language, the interests promoted, and the evils to be addressed by section 4704(a)(2) and section 6308(a)(2) are identical," *id.*, and, thus, suggested that the *Tarbert/Blouse* guidelines necessarily should apply to both commercial and non-commercial vehicle inspection programs.

The dissent further asserted that the *Burger* test and the *Tarbert/Blouse* guidelines are compatible because they both limit the discretion of inspecting officers. In the dissent's view, "the *Tarbert/Blouse* guidelines provide a practical framework for ensuring that the inspection program provides a constitutionally adequate substitute for a warrant." *Id.* For these reasons, the dissent took the position that the *Tarbert/Blouse* guidelines apply to commercial vehicle inspections.

The dissent ultimately concluded that the record supports the trial court's finding that the Team's inspection program failed to comply with the *Tarbert/Blouse* guidelines. In particular, the dissent agreed with the trial court's conclusion that "Trooper Beaver's testimony as to how officers determined which vehicles to stop at the checkpoint did not

---

**Authority of police officer.--**Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b).

support a finding that the procedure followed objective standards." *Id.* at 300. Instead, the dissent posited, the Team's procedure allowed for officer discretion because it "permitted each of the officers to perform inspections and, when available, the officer could inspect the next truck that entered the landfill." *Id.* Thus, the dissent speculated, "if all of the officers on the [T]eam were occupied with inspections, one truck, or many, could enter the landfill without inspection." *Id.* Because the dissent believed that this procedure allowed officers too much discretion as to which trucks would be stopped and inspected, the dissent concluded that the Team's inspection program violated the *Tarbert/Blouse* guidelines and, therefore, was unconstitutional. Accordingly, the dissent would have affirmed the order granting Appellant's motion to suppress.

Appellant filed a petition for allowance of appeal, which this Court granted to address the following issues, as he framed them:

> 1. Whether the Superior Court committed an error of law/abuse of discretion in reversing the trial court's suppression of the evidence obtained during the commercial vehicle stop based upon failure to abide by the *Tarbert/Blouse* guidelines?
>
> 2. Whether the Superior Court committed an error of law/abuse of discretion in determining that the *Tarbert/Blouse* guidelines do not apply to commercial vehicle check-points?
>
> 3. Whether the Superior Court committed an error of law/abuse of discretion in failing to affirm the decision of the trial court on alternate grounds?

*Commonwealth v. Maguire*, 190 A.3d 1130 (Pa. 2018).

## II. Primary Issue: Whether the *Tarber/Blouse* guidelines or the *Burger/Petroll* test apply to government inspection programs of commercial vehicles.

We begin by addressing Appellant's claim that the Superior Court erred by concluding that the *Tarbert/Blouse* guidelines are inapplicable to government inspection

programs of commercial vehicles.[2]  In cursory fashion, Appellant adopts the reasoning of the Superior Court dissent in arguing that the *Tarbert/Blouse* guidelines apply with equal force to government inspection programs of both commercial and non-commercial vehicles.  Appellant's Brief at 17-20.

The core of the Commonwealth's argument largely echoes the reasoning of the Superior Court majority.  The Commonwealth concedes that the *Tarbert/Blouse* guidelines provide an exception for police to conduct warrantless vehicle stops.  The Commonwealth, however, highlights that, in *Burger*, *supra*, the United States Supreme Court held that a different, less rigorous exception to the Fourth Amendment's warrant requirement exists for closely regulated industries.  Citing to a string of cases including *Petroll*, the Commonwealth emphasizes that commercial vehicles, like Appellant's dump truck, are part of a closely regulated industry.  Accordingly, the Commonwealth posits that the three-factor *Burger* test is specifically designed to address the constitutionality of statutorily authorized warrantless inspections of commercial vehicles, rendering the *Tarbert/Blouse* guidelines inapplicable to such inspections.  For the reasons that follow, we agree with the Commonwealth.

In *Tarbert*, this Court addressed whether police-conducted sobriety checkpoints, which apply to the public generally, violate Article I, Section 8 of the Pennsylvania Constitution, which, similar to the Fourth Amendment, prohibits unreasonable searches

---

[2] This issue presents the Court with a question of law.  Thus, like all questions of law, our standard of review is *de novo*, and our scope of review is plenary.  *Skotnicki v. Ins. Dep't*, 175 A.3d 239, 247 (Pa. 2017).  We further note two aspects regarding the manner in which we review suppression orders generally.  First, "[w]e are bound by the suppression court's factual findings so long as they are supported by the record[.]"  *Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017).  Second, "[o]ur scope of review of suppression rulings includes only the suppression hearing record . . .."  *Id.*

and seizures.[3]  The Court was unable to reach a majority position in *Tarbert*.  However, the Opinion Announcing the Judgment of the Court ("OAJC") acknowledged several indisputable principles of law.  For example, the OAJC explained that people have less of an expectation of privacy in their vehicles than they do in their homes but that occupants of vehicles do not forfeit all expectations of privacy.  *Tarbert*, 535 A.2d at 1038 (plurality) (citing *Delaware v. Prouse*, 440 U.S. 648 (1979)).

To ensure that police officers do not encroach on the constitutional rights of drivers during systematic sobriety checkpoints conducted without a warrant, the OAJC suggested the guidelines discussed above, namely:

(1) vehicle stops must be brief and must not entail a physical search;

(2) there must be sufficient warning of the existence of the checkpoint;

(3) the decision to conduct a checkpoint, as well as the decisions as to time and place for the checkpoint, must be subject to prior administrative approval;

(4) the choice of time and place for the checkpoint must be based on local experience as to where and when intoxicated drivers are likely to be traveling; and

(5) the decision as to which vehicles to stop at the checkpoint must be established by administratively pre-fixed, objective standards, and must not be left to the unfettered discretion of the officers at the scene.

*Worthy*, 957 A.2d at 725; *Tarbert*, 535 A.2d at 1043 (plurality).

Subsequently, this Court decided *Blouse*, which involved the constitutionality of a checkpoint set up by police to detect license, registration, and equipment violations. Thus, the *Blouse* Court was confronted with a more generic issue than that presented in *Tarbert*:  whether systematic, non-discriminatory, non-arbitrary safety checkpoints

---

[3] It is well settled that when a government agent stops a vehicle and detains its occupants, a seizure has occurred that is subject to constitutional restraints.  *Blouse*, 611 A.2d at 1178.

conducted by police are constitutionally permissible under Article I, Section 8 of the Pennsylvania Constitution. In addressing this issue, a majority of the *Blouse* Court expressly adopted the *Tarbert* guidelines for purposes of assessing generally applicable, systematic safety checkpoints because the guidelines "achieve the goal of assuring an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Blouse*, 611 A.2d at 1180. Thus, *Blouse* makes clear that, when police set up a checkpoint to which all drivers will be subject, the checkpoint must substantially comply with the *Tarbert/Blouse* guidelines to survive constitutional scrutiny. *Id.* at 1180-81.

In contrast to the generally applicable searches and seizures that occur at the checkpoints at issue *Tarbert* and *Blouse*, in *Petroll*, this Court was confronted with how to examine the constitutionality of warrantless searches of commercial vehicles. *See Petroll*, 738 A.2d at 996 ("The present appeal questions whether the warrantless searches of Appellant's tractor-trailer and subsequent seizures of evidence violate Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution."). In performing this task, the Court cited to *Burger* and stated, "Some industries have such a true history of government oversight that owners of those closely regulated businesses should have little or no expectation of privacy. Depending on the statutory scheme, owners of certain closely regulated businesses should expect that their businesses would be subject to warrantless administrative searches." *Id.* at 1000 (citation omitted).

The Court then explained that, in *Burger*, *supra*, the United States Supreme Court held that warrantless searches of closely regulated businesses will be deemed reasonable if: (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection was made; (2) warrantless inspections are

necessary to further that regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant. "In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* at 1000-01 (quoting *Burger*, 482 U.S. at 703). In applying this test to the circumstances at issue in *Petroll*, the Court expressly determined that trucking is a closely regulated industry. *Id.* at 1001.

A review of *Tarbert*, *Blouse*, *Petroll*, and *Burger* makes clear that the *Tarbert/Blouse* guidelines test the constitutionality of government-conducted checkpoints to which all drivers are subjected. Conversely, the *Burger/Petroll* test is designed to examine the constitutionality of statutorily authorized government inspections that are aimed at and limited to closely regulated industries, which have a lesser expectation of privacy than the public generally. Further, it is indisputable that the government inspection authorized by Subsection 4704(a)(2) and which took place in this case was aimed at the trucking business, which is a closely regulated industry.

Consequently, contrary to Appellant's position throughout this litigation, we hold that the *Tarbert/Blouse* guidelines are inapplicable to statutorily authorized government inspections of commercial vehicles, like the inspections permitted by Subsection 4704(a)(2) of the Vehicle Code. Rather, as the Superior Court correctly concluded, the constitutionality of these inspections is measured by the less stringent three-factor *Burger/Petroll* test.

Given these conclusions, we need not address Appellant's contention that the Team's inspection program failed to meet the *Tarbert/Blouse* guidelines. Appellant's Brief at 13-17. That does not end our inquiry, however, as Appellant offers several alternative

arguments in support of his position that, even if the *Tarbert/Blouse* guidelines do not apply to commercial vehicle inspection programs, the Superior Court nonetheless erred by reversing the trial court's order. *Id.* at 20-29. We will address these alternative arguments *seriatim*.

### III. Alternative Arguments

Appellant initially asserts that the Team's inspection program failed to meet the requirements of the *Burger/Petroll* test.[4] In so doing, Appellant challenges particular aspects of the inspection that occurred in this case. For example, Appellant contends that, by setting up the inspection on a private lane leading to the entrance of the landfill, the Team's inspection program failed to meet the legitimate government goal of removing unsafe vehicles from roadways. *Id.* at 21-22. In general, Appellant suggests that various factual circumstances underlying the warrantless inspection of his truck "extended beyond that necessary to determine if the vehicle being operated by [ ] Appellant was unsafe for operation of public roadways." *Id.* at 24.

Appellant's argument evinces a misunderstanding of the *Burger/Petroll* test. As the First Circuit of the United States Court of Appeals aptly explained, "The *Burger* criteria apply to a regulatory scheme generally, not to the particular search at issue. In other words, the *Burger* criteria are applied generally to a statutory scheme, not to a given set of facts arising under that scheme."[5] *United States v. Maldonado*, 356 F.3d 130, 136 (1st

---

[4] In response, the Commonwealth posits that the Team's inspection program was constitutional because it met all three prongs of the *Burger/Petroll* test. Commonwealth's Brief at 32.

[5] Citing to *Doe v. City of San Diego*, 198 F.Supp.3d 1153 (S.D. Cal. 2016), Chief Justice Saylor disagrees with the First Circuit's conclusion that the *Burger* criteria apply to a regulatory scheme and not to the particular search at issue. Concurring Opinion at 2-3. Yet, nothing in *Doe* undermines this conclusion. In fact, *Doe* entirely supports the First Circuit's reasoning that a *Burger* analysis focuses on the codified governmental scheme at issue, not the factual circumstances of a particular inspection. *Doe*, 198 F.Supp.3d at

Cir. 2004) (citation omitted); *see, e.g., Burger, supra* (examining the constitutionality of a New York statutory scheme that allows surprise, warrantless inspections of vehicle dismantling businesses). Accordingly, Appellant's argument fails on its face.

Appellant's final contention involves a statutory-based claim. Appellant's Brief at 24-27. He suggests that the Team's inspection program was not "systematic," as required by Subsection 4704 of the Vehicle Code. *See, e.g., id.* at 27 ("Therefore, as the inspection program being conducted in the within matter is not 'systematic,' it has failed to abide by the terms of Section 4704, thus converting the interactions with [Appellant] into a warrantless search with no statutory authority."). More specifically, Appellant maintains that the procedure utilized by the Team provided too much discretion to the inspecting officers. In support of this position, Appellant asserts, notably without record support, that "if the officer took some extra time dealing with one vehicle, he could allow other vehicles to bypass the checkpoint, while, if he wished to examine [a] particular vehicle, he could

---

1163 (citing to and quoting *Burger*, stating, "Among other things, warrantless searches and seizures on commercial property in pervasively regulated industries are constitutionally permissible if the underlying *statute's* inspection program, 'in terms of the certainty and regularity of its application, [provides] a constitutionally adequate substitute for a warrant.' To comply with this requirement, the *statute* must have 'a properly defined scope, and it must limit the discretion of the inspecting officers.' To properly limit the discretion of the inspectors, the *statute* 'must be carefully limited in time, place, and scope.') (citations omitted) (emphasis added).

To be clear, we agree with the Chief Justice that a defendant can bring an "as applied" challenge to a search allegedly conducted pursuant to a statute. In such a circumstance, a defendant could object to the governmental inspection on the basis that it exceeded the scope of or otherwise was contrary to statutory authority and, in turn, was unconstitutional. If there were merit to the statutory aspect of the defendant's challenge, then the government would be required to demonstrate that the search comported with traditional standards related to warrantless searches, not with the *Burger/Petroll* criteria. As we discuss in detail *infra*, Appellant did not raise such a challenge in his motion to suppress.

simply end his interaction with his current inspection and ask the oncoming vehicle to submit to inspection." Appellant's Brief at 25.

We acknowledge that Appellant did argue at the suppression hearing that the Team's inspection program was not systematic. However, Appellant presented this argument within the context of the only issue that he raised in his motion to suppress, namely, that the Team's inspection of his truck was unconstitutional because it failed to comply with the *Tarbert/Blouse* guidelines. To illustrate, while explaining to the trial court why the Team allegedly did not perform its inspection systematically, Appellant's counsel stated, "The case law basically says it must not be left to the unfettered discretion of the officers at the scene." N.T., 3/14/2016, at 18. This statement clearly invoked the fifth prong of the *Tarbert/Blouse* guidelines; it did not challenge the systematic requirement of Subsection 4704(a)(2). *See Worthy*, 957 A.2d at 725 (describing the fifth *Tarbert/Blouse* guideline as requiring that "the decision as to which vehicles to stop at the checkpoint . . . must not be left to the unfettered discretion of the officers at the scene"). Thus, because Appellant raises this statutory-based claim for the first time on appeal, it is waived.[6] *See*

_____

[6] In their responsive opinions, Chief Justice Saylor and Justice Wecht disagree with our conclusion that Appellant waived his statutory-based argument. Concurring Opinion at 4-5 (Saylor, J., concurring); Concurring and Dissenting Opinion at 8-10 (Wecht, J., concurring and dissenting). Both of my colleagues suggest that, because Appellant prevailed on his motion to suppress and was an appellee in the Superior Court, Appellant had no issue-preservation obligations in the Superior Court.

The Pennsylvania Rules of Criminal Procedure, however, make clear that a motion to suppress must "state specifically and with particularity," *inter alia*, "the grounds for suppression." Pa.R.Crim.P. 581(D). The Comment to Rule 581 further provides that all motions to suppress must comply with Rule of Criminal Procedure 575. *Comment* to Pa.R.Crim.P. 581. Rule 575, in turn, plainly states that "[t]he failure, in any motion, to state a type of relief or ground therefor shall constitute a waiver of such relief or ground." Pa.R.Crim.P. 575(A)(3).

Here, Appellant's motion to suppress and his argument at the suppression hearing focused exclusively on his contention that the inspection of his vehicle was

Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

## IV. Conclusion

Because Appellant has not presented the Court with any issue or argument that warrants relief, we affirm the Superior Court's judgment, which reversed the trial court order granting Appellant's motion to suppress. The matter is remanded to the trial court for further proceedings.

Justices Dougherty and Mundy join the Opinion.

Chief Justice Saylor and Justice Todd join the opinion with respect to Parts I, II, and IV, and concur in the result as to Part III.

Justices Wecht and Donohue join the opinion with respect to Part I, concur in the result as to Part II, and dissent as to Parts III and IV.

Chief Justice Saylor files a concurring opinion in which Justice Todd joins.

Justice Wecht files a concurring and dissenting opinion in which Justice Donohue joins.

---

unconstitutional because it failed to comply with the *Tarbert/Blouse* standards. He did not claim, as he does for the first time in this appeal, that suppression is required because the Team's inspection did not comply with the requirements of Subsection 4704(a)(2). Thus, Appellant waived this ground for purposes of challenging the legality of the inspection.

Lastly, if, as my colleagues seem to suggest, Appellant intended his statutory-based argument to demonstrate that the inspection in this case failed to meet the third prong of the *Burger/Petroll* standard, then the argument fails because it focuses on the search at issue and not Subsection 4704(a)(2) specifically, which, as discussed *supra*, is a misguided analysis.